

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEM
F. #2021R00393

*610 Federal Plaza*
*Central Islip, New York 11722*

March 26, 2024

<u>By ECF and Courtesy Copy by Interoffice Mail</u>

The Honorable Joan M. Azrack
United States District Judge
United States District Court
Eastern District of New York
920 Federal Plaza
Central Islip, New York 11722

      Re:    <u>United States v. Donald Finley</u>
               <u>Criminal Docket No. 23-181 (JMA)</u>

Dear Judge Azrack:

      The government respectfully submits this letter in connection with the sentencing of defendant Donald Finley, in the above-referenced matter. For the reasons that follow, the government submits that a sentence of 41 to 51 months' incarceration, would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

      I.    <u>Factual Background</u>

      In March 2020, the United States (and indeed, the entire world) was confronted with a public health crisis of unprecedented proportions amid the onset of the COVID-19 pandemic.[1] Recognizing that countless American businesses had been shuddered as a result of the virus' rapid spread, on March 29, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to provide emergency financial assistance to distressed small businesses. <u>See</u> United States Probation Department ("Probation") <u>Presentence Investigation Report</u> ("PSR"), prepared September 28, 2023, at ¶¶ 6-8.

      As part of the CARES Act, funds were allocated for the issuance of forgivable loans to small businesses for job retention and payroll-related expenses via the Paycheck Protection Program ("PPP program"). <u>Id.</u> The PPP program allowed qualifying small businesses to receive unsecured loans to address business expenses such as payroll, rent, mortgage-related payments

---

[1] According to the website of the World Health Organization, the COVID-19 pandemic has claimed 6.9 million lives worldwide and 1.1 million lives in the United States. <u>See</u> <u>https://data.who.int/dashboards/covid19/deaths?n=c</u> (last visited March 8, 2024).

and utilities. PSR at ¶ 6. If the PPP funds were used for their intended purposes and in accordance with the program's terms, the loans would be forgiven. Id. The PPP program was overseen by the Small Business Administration ("SBA") and various financial institutions received and processed the PPP loan applications, which, if approved, would then be funded directly by the lenders and backed by the federal government. Id. The amount of the loans was determined by a formula which required applicants to truthfully report information such as the business's number of employees and payroll costs, and to provide corroborating documentation. Id. In addition to the PPP program, the CARES Act also provided funding for the Economic Injury Disaster Loan Program ("EIDL program"), which was an SBA program designed to provide up to $2 million in loans to eligible small businesses that experienced financial disruption due to the COVID-19 pandemic. Id. Like the PPP program, the EIDL program required applicants to use an online portal to truthfully report to the SBA information related to a business' operations for the preceding twelve-month period. Id. Also like the PPP program, EIDL program funds could only be used for limited, business-related purposes. Id.

In this unprecedented public health crisis, Finley, unlike so many other Americans who were also suffering, sought to take advantage of the situation; amid massive public suffering, he saw an opportunity to steal money designed to ease the suffering of those who followed the rules for the common good. Beginning in March of 2020, and continuing through March 2021, Finley utilized his companies, some of which were inactive or created just prior to or during the pandemic (the "Companies"), to submit 20 false PPP loan applications—each supported by fraudulent and falsified tax returns—to steal more than $3.2 million in disaster relief funds. PSR at ¶¶ 9-10. In a number of these filings, Finley utilized his wife or daughters as nominees of the applicable company. PSR at ¶ 9.

Specifically, Finley submitted 29 online applications for the Companies (20 PPP loans and nine EIDL loans)—applications that contained false information, bogus financial data, and fabricated supporting documentation, all of which was designed to fraudulently induce the SBA and the lenders administering the PPP and EIDL programs to approve all 29 applications totaling nearly $3.2 million. PSR at ¶ 10. Once the loans were approved, Finley sent the funds through more than 30 bank accounts to prevent tracing of the proceeds, with substantial portions of the stolen funds being utilized to purchase real property in Nantucket, Massachusetts on February 5, 2021 (the "Nantucket Property.") Information ¶ 10, Doc. No. 1. In addition, at the time Finely was requesting and receiving CARES Act funds he paid more than $15,0000 to two separate private New York yacht clubs.

II.   Procedural Background

On May 25, 2023, Finley was arrested and charged by information with disaster relief fraud and wire fraud, in violation of §§ 18 U.S.C. § 1040(a)(2) and 1343, respectively. See United States v. Finley, 23-CR-181, ECF Doc. No. 1. Finley pled guilty to both counts the same day.

III.   Sentencing Guidelines

On September 28, 2023, Probation disclosed the PSR, in which it calculated Finley's advisory Guidelines range to be 51 to 63 months' imprisonment. PSR at ¶ 73. At the

time Probation calculated the Guidelines, they were accurate. However, the defendant has objected to the calculation based on recent amendments to the Guidelines. Def. Sent'g Memo 27, Doc. No. 19. The government agrees with the defendant's objection. More specifically, the government agrees the defendant is a criminal history category I, and that the following Guidelines analysis is now applicable to the defendant:

| | | |
|---|---|---:|
| | Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus: | Loss in excess of $1.5 Million, but not Greater Than $3.5 million (U.S.S.G. § 2B1.1(b)(1)(I)) | +16 |
| Plus: | Disaster Relief Fraud (U.S.S.G. § 2B1.1(b)(12)) | +2 |
| Plus: | More than $1 Million Derived from a Financial Institution (U.S.S.G. § 2B1.1(b)(17)(A)) | +2 |
| Less: | No Prior Criminal History Points (U.S.S.G. § 4C1.1) | -2 |
| Less: | Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a) and (b)) | <u>-3</u> |
| | Total: | <u>22</u>[2] |

Based upon a total offense level of 22 and Criminal History Category I, Finley's advisory Guidelines range is 41 to 51 months' imprisonment. We would respectfully ask the Court to adopt this analysis and associated Guidelines range.

    IV.    <u>Argument</u>

As set forth herein, a fair application of the § 3553(a) factors compels the conclusion that a Guidelines sentence of 41 to 51 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

    A.  <u>The Advisory Range and Kinds of Sentences Available</u>
         <u>(18 U.S.C. § 3553(a)(3), (a)(4)(A))</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory but should be considered in conjunction with the factors outlined in § 3553(a). Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but <u>Booker</u> allows the court to "tailor the sentence in light of other statutory concerns[.]" <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (citing <u>Booker</u>, 543 U.S. at 245-46; <u>Gall v. United States</u>, 552 U.S. 38, 46-49 (2007)). However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'"

---

    [2]    The PSR correctly conducts a unit analysis for both counts; however, this analysis does not affect the defendant's Guidelines range.

when determining a defendant's sentence. Kimbrough, 552 U.S. at 108 (citing Gall, 552 U.S. at 49; Rita v. United States, 551 U.S. 347-50 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a). Id. That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and

(2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

Here, the Guidelines certainly counsel for a substantial prison term. Indeed, the Guidelines call for a sentence of 41 to 51 months' imprisonment.

B. The Nature and Circumstances of the Offense
(18 U.S.C. § 3553(a)(1))

The nature and circumstances of Finley's criminal conduct call for a stringent sentence. This was not a crime of desperation, but a crime of greed, in which Finley defrauded the SBA and financial institutions of approximately $3.2 million. This fact alone makes a Guidelines sentence appropriate.

Initially, the Guidelines accurately reflect the seriousness of the defendant's crime. See 18 U.S.C. § 3553(a)(2)(A). In a once-in-a-generation public health crisis, the defendant saw an opportunity to manipulate a government welfare program for his own self-enrichment. In that regard, it bears emphasizing the deliberate and repeated steps the defendant took to effectuate his fraud—taking time away from his personal and professional life amid the COVID-19 pandemic to create and submit 29 separate fraudulent loan applications, on behalf of twenty different entities, over the course of several months. Notably, accompanying each PPP application were fake tax documents purporting to show that a particular corporate entity was paying wages in hundreds of thousands of dollars when, in actuality, various companies were inactive or created just prior to or during the pandemic, demonstrating the defendant had no intention of using any loan proceeds to support those businesses or their fictious employees. In fact, in 2019 Finley only reported wages for his employees of $69,000[3] for all his legitimate companies – at the very same time Finley

---

[3]     In 2019, prior to the pandemic, Finley only reported $69,000 in employee payroll for six employees. Given this occurred before the pandemic, this was arguably a staff of full capacity. Finley claims that during the pandemic he poured "the relief funds into his suffering businesses. . .." Def. Sent'g Memo 25. Conspicuously, the $1.2 million in

reported paying employee wages of $4,848,401 while filing for his fraudulent CARES Act funds. That the defendant began this venture just four days after the enactment of the CARES Act, when disaster relief funds first became available, speaks to the truly depraved nature of the offense conduct.

Most offensively, this scheme was specifically designed to exploit an international public health emergency to in-part line Finley's pockets. The federal government mobilized to meet the momentous challenges the pandemic presented, working collaboratively with private financial institutions to provide disaster relief funds as quickly as possible to distressed small business owners. It was against that backdrop that Finley saw an opportunity; while Americans were dying by the thousands and unemployment was steadily rising,[4] Finley went to extraordinary lengths to submit 29 loan applications in the names of fake companies, fabricate tax documents, and carefully move money through a web of accounts.

The COVID-19 pandemic was unprecedented, and the defendant's callous choice to secure the Nantucket Property during a time of crisis is particularly egregious. Similarly, the scope of his fraud in light of the nature of the emergency ongoing in the United States at the time is staggering. The nature and circumstances of this defendant's crimes clearly supports the imposition of a Guidelines sentence.

The Court should reject the defendant's current contention that the criminal scheme was somehow primarily designed to benefit Finley's employees and that Finley "submitted more than one loan application for the same business only after considerable time had elapsed with no information on the status of his original loan . . .." See, Def. Sent'g Memo 13, Fn 3. This is an attempt by the defendant to minimize his illegal conduct – conduct that he has acknowledged was criminal – not a mere oversight or mistake. This after-the-fact justification is wholly inconsistent with his use of government funds to purchase the Nantucket Property. The government's investigation has directly traced CARES Act monies to the purchase of the Nantucket Property. The defendant attempts to cleanse the purchase of the Nantucket property by claiming, "Finley's mistake was that he deposited some of the pandemic funds he received into business accounts he was also using to fund the [Nantucket Property] re-purchase. Critically, however, he had funds in

---

legitimate CARES Act funds he received is more than 17 times his payroll reported pre-pandemic. Additionally, it is more than 46 times the $3.2 million dollars stolen by Finley. Furthermore, in 2020 Finley reported total payroll of $131,055. Of the $131,055 in payroll, $86,795 were payable to Finley, his wife or his children – not to his employees. This casts substantial doubt on the defendant's claims regarding his intended use of the CARES Act funds.

[4] See United States Bureau of Labor Statistics, https://www.bls.gov/opub/mlr/2022/article/us-labor-market-shows-improvement-in-2021-but-the-covid-19-pandemic-continues-to-weigh-on-the-economy.htm#:~:text=The%20recession%20induced%20by%20the,to%20leave%20the%20labor%20force (last visited March 8, 2024).

his accounts sufficient to cover the purchase price *independent of the pandemic funds he received.*" Id. 26.

   Finley's claims are troubling for at least two reasons. First, Finley created an economic cushion by comingling his funds with the fraudulently obtained funds. Now, he argues, in essence, that only the legal funds were used for the purchase of the Nantucket Property. Even assuming Finley did have enough personal funds to cover the purchase, he should not now benefit from his illegal creation of a surplus of funds, a financial cushion, to backstop the purchase of the Nantucket Property. It remains unclear if Finley would have been able to secure the purchase of the Nantucket Property without this financial cushion. It should also be noted that the Nantucket Property was never purchased in Finley's name. Rather, the Nantucket Property was purchased in the name of Finley's 82 year old mother. Investigators stopped attempting to interview Finley's mother after Finley retained current counsel. Not surprisingly, at the time Finley was able to purchase the Nantucket Property, he had already received approval for $3,600,000 in CARES Act funding. Subsequent to the purchase, Finley applied for, and received, more than $1.4 million in government disaster funds.

   Second, separate and apart from the debate regarding weather Finley had enough funds to legally purchase the Nantucket Property is the fact that if Finley had this type of "extra" money, as he claims he did, then why didn't he use this excess of cash to legally invest in his suffering businesses and protect his employees. If Finley did in fact have the money, then the answer is clear, he chose not to take the chance that his businesses failed on his own dime, rather, he used the illegally obtained funds in part to help finance those businesses, while still being able to "legally" secure the Nantucket Property, arguably with some of his own funds. A review of the defendant's finances offers insight into this theory. Namely, the defendant has become accustomed to a certain lifestyle, indeed he submitted an updated request to the Department of Probation of his "necessary monthly expenses" which included, among other things: (1) $7,000 for vacation property; (2) $1,300 on a boat; (3) $2,000 on landscaping/snow removal, pool maintenance, and sprinkler maintenance; and (4) $2,000 in unidentified expenses. PSR Addendum 3-5. The defendant's actions in this case make clear, Finely cares about his business and employees, but he will not allow it to change his lifestyle. A concept highlighted by the purchase of the Nantucket Property.

   The fact is that no matter how the defendant's use of his ill-gotten money is analyzed, the defendant had a choice. Finley chose preserved his lavish lifestyle instead of doing what most Americans were forced to do during the pandemic. Most people had to tighten their belts, do more with less, downsize and struggle. The defendant, while living in the comfort of his 14 bathroom, 11,000 square foot, eight-acre estate, estimated to be worth approximately $7 million,[5] chose to buy the Nantucket Property for more than $2 million. This was an act of greed, made possible by his retention of illegally obtained disaster relief funds. The Court should hold him accountable for this conduct when sentencing him.

---

[5] Se ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (last checked March 25, 2024).

C. <u>History and Characteristics of the Defendant</u>
   (18 U.S.C. § 3553(a)(1))

The government agrees that the defendant has no prior criminal convictions.

D. <u>Seriousness of the Offense</u>
   (18 U.S.C. § 3553(a)(2)(A))

The seriousness of Finley's conduct cannot be overstated. He stole millions of dollars that were intended to relieve an unimaginable emergency that impacted the entire country. Far from caring about others in a time of need, Finley lied and defrauded financial institutions to steal millions of relief dollars. The theft of million dollars that was earmarked for disaster relief certainly supports the imposition of a term of imprisonment of 41 to 51 months.

E. <u>Promote Respect for the Law</u>
   (18 U.S.C. § 3553(a)(2)(A))

As with the seriousness of the offense, the need to promote respect for the laws against fraud and the theft of disaster relief funds call for a substantial sentence to ensure that in the next national emergency, would-be fraudsters like Finley do not think they can steal to benefit themselves at the expense of people in real need. The facts of this case require a stringent custodial term to promote the respect for such laws, and a 41 to 51 month prison term is warranted.

F. <u>Just Punishment</u>
   (18 U.S.C. § 3553(a)(2)(B))

In this case, a 41 to 51 month prison term is a just punishment. Indeed, such a sentence is mandated by the totality of the circumstances. As explained above, Finley saw in the government's response to the COVID-19 pandemic an opportunity to enrich himself.

G. <u>Deterrence</u>
   (18 U.S.C. § 3553(a)(2)(B))

In this case, general deterrence is vitally important. General deterrence will be served by a Guidelines sentence, as people must understand that if they elect to steal and line their pockets with funds designed to bring aid to the public during times of crisis, they will be dealt with harshly.

V. <u>Conclusion</u>

   As set forth above, the § 3553(a) factors call for a Guidelines prison term. The government respectfully submits that a sentence of 41 to 51 months' imprisonment is a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

                Respectfully submitted,

                BREON PEACE
                United States Attorney

        By:  /s/_____
                Mark E. Misorek
                Assistant U.S. Attorney
                (631) 715-7874

cc:  Counsel of Record (by ECF and email)
   Clerk of the Court (JMA) (by ECF)